UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE GAZELLE GROUP, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> NAISMITH MEMORIAL BASKETBALL ) <br> HALL OF FAME, INC. ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff The Gazelle Group, Inc. ("Gazelle") brings this complaint against Defendant Naismith Memorial Basketball Hall of Fame, Inc. ("HOF"). In support of its claims, Gazelle alleges the following based on personal knowledge with respect to its own acts and on information and belief with respect to the actions of others:

### PRELIMINARY STATEMENT

1. In August 2020, HOF approached Gazelle, a sports-marketing company that holds annual pre-season college basketball tournaments, about holding two of Gazelle's tournaments and creating joint basketball games at Mohegan Sun Arena in Connecticut, where HOF would also be holding a tournament.

2. Gazelle and HOF negotiated and agreed to a formula to distribute revenues and expenses for the games (the "Agreement"), based on whether a game was part of a Gazelle tournament, a HOF tournament, or a jointly organized game.

1

3. The Agreement was memorialized in numerous emails, calls, and virtual meetings, and the parties regularly discussed and reviewed the agreed-to formula as sponsors were signed and game schedules finalized.

4. As a result of COVID-19, many HOF games and some joint games were cancelled, but all of Gazelle's games went forward.

5. Under the terms of the Agreement, this resulted in Gazelle being entitled to a higher share of revenues than HOF had originally anticipated, but that Gazelle also paid an increased share of the expenses due to a higher proportion of Gazelle games going forward.

6. After the games were completed and all sponsorship revenue had been collected, HOF sought to unilaterally change the Agreement's terms and impose new sponsorship revenue calculations that HOF created months after the games were completed and that favored HOF.

7. To gain leverage, HOF withheld funds it owed to Gazelle under the Agreement, and it did not remit those funds to Gazelle because Gazelle refused to agree to the new calculations that HOF sought to impose.

8. HOF continues to withhold all funds that it owes to Gazelle, including funds that HOF has admitted it owes, and it continues to demand that Gazelle agree to entirely new terms if Gazelle wants payment.

## PARTIES

9. Plaintiff The Gazelle Group, Inc. is a Delaware corporation with its principal place of business in Princeton, New Jersey.

10. Defendant Naismith Memorial Basketball Hall of Fame, Inc. is a Massachusetts corporation with its principal place of business in Springfield, Massachusetts.

## JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000.

12. This Court has personal jurisdiction over HOF because it is a Massachusetts corporation and its principal place of business is in Massachusetts.

13. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b) because HOF resides in this district.

## FACTUAL ALLEGATIONS

### HOF Approaches Gazelle

14. Gazelle is a sports-marketing company that creates and consults on a variety of sports and entertainment events.

15. Since its inception, Gazelle has formed relationships with corporate sponsors, television networks, and sports teams which have enabled it to negotiate multi-million dollar contracts for its clients.

16. Among other events, Gazelle has for years organized two non-conference college basketball tournaments in New York: the Empire Classic, which is typically held at Madison Square Garden, and the Legends Classic, which is held annually at the Barclays Center.

17. HOF also organizes basketball tournaments, including an annual non-conference basketball tournament, the Hall of Fame Tip Off Tournament, which takes place at Mohegan Sun Arena in Connecticut.

18. In the summer of 2020, due to limitations on live sporting events in the State of New York as a result of COVID-19, Gazelle was considering different venues outside of New York State to hold the Empire Classic and Legends Classic basketball tournament.

19. In August 2020, HOF approached Gazelle with a proposal to meet with Mohegan Sun officials to discuss holding Gazelle's tournaments at Mohegan Sun Arena and creating joint basketball games that would also take place at Mohegan Sun Arena.

20. Gazelle and HOF agreed that each would organize tournaments at Mohegan Sun Arena and provide the teams and games for their respective tournaments, with Gazelle responsible for the Empire Classic and the Legends Classic, and HOF responsible for the Hall of Fame Tip Off Tournament.

21. In addition, the parties contemplated additional games that they would organize as joint games to take place at Mohegan Sun Arena.

**Gazelle and HOF Agree to the Distribution of Costs and Revenue**

22. Before any games were played at Mohegan Sun Arena, Gazelle and HOF negotiated and agreed to a formula to distribute revenues and expenses for the games (the "Agreement").

23. For each game, sponsorships were sold to various businesses who could advertise their products and services.

24. Gazelle marketed and sold sponsorships using its in-house team and relationships developed over many years.

25. HOF used a third party, Learfield IMG College ("IMG"), to sell its sponsorships for the event.

26. HOF communicated to Gazelle that IMG was HOF's agent for the purpose of selling these sponsorships.

27. Because the events had different ownership structures, sponsorships for different games were treated differently under the Agreement, depending on which party sold the

sponsorship and whether a specific game was a "Gazelle game" (organized by Gazelle), a "HOF game" (organized by HOF), or an additional game that Gazelle and HOF organized jointly.

28. After being informed that IMG would act as HOF's agent for the purpose of sponsorships, Gazelle negotiated and agreed to a sales commission structure (the "Sponsorship Formula") with IMG, HOF's agent:

   a. A commission was only payable if one entity sold sponsorships for the other entity's games;

   b. Gazelle would receive a 20% commission if it sold sponsorships for HOF games, with the remaining 80% payable to HOF;

   c. HOF would receive a 20% commission if it (or IMG on HOF's behalf) sold sponsorships for Gazelle games, with the remaining 80% payable to Gazelle; and

   d. For the sale of sponsorships for any jointly organized games, the commission structure consisted of 30% payable to the selling entity, with the remaining 70% to be split equally between Gazelle and HOF.

29. The Sponsorship Formula was subsequently confirmed by Gazelle and HOF in an exchange of emails on October 28, 2020 that included representatives of Gazelle, HOF, and IMG, and it was agreed to orally in conversations between representatives for Gazelle, HOF, and IMG.

30. The Sponsorship Formula was also confirmed by the parties' course of dealing and numerous subsequent emails and conversations leading up to the tournaments at Mohegan Sun Arena.

31. As part of the Agreement, the parties agreed that the selling party would collect payments for the sale of sponsorships, so, for example, HOF collected payments for (i)

sponsorships that HOF and IMG sold for Gazelle games and (ii) sponsorships that HOF sold for jointly organized games.

32. Under the Agreement, each party would also be responsible for certain game-related expenses, depending on whether a given game was a Gazelle game, a HOF game, or a joint game (the "Expense Formula").

33. Finally, the parties agreed to conduct a final distribution after the games were completed (the "Final Distribution"), using the Sponsorship Formula and the Expense Formula that the parties had agreed upon to calculate what each party owed or was owed based on that party's share of sponsorship revenues less its share of expenses.

34. In the weeks leading up to the event, Gazelle regularly circulated spreadsheets reflecting the Sponsorship Formula, delineated in both percentage and dollar amounts, and the Expense Formula.

35. These spreadsheets were updated regularly as sponsors were signed and game schedules were finalized.

36. Gazelle, HOF, and IMG reviewed the spreadsheets on a regular basis during conference calls and email exchanges.

37. And HOF and IMG provided regular feedback to Gazelle on the spreadsheets, with IMG referring to the spreadsheet that was circulated as "our master tracker of all the deals" in the days before the event began.

### The Event and Game Cancellations

38. Relying on the Agreement with HOF, Gazelle enlisted a number of basketball teams to play games at Mohegan Sun Arena, which were ultimately completed between November 25, 2020 and December 4, 2020.

39. Due to COVID-19, certain HOF games were cancelled, but all Gazelle games and some joint games went forward.

40. Importantly for sponsorship purposes, eight Gazelle games were broadcast on premium sports television channels.

41. By contrast, only one HOF game was broadcast on a premium television channel.

42. A higher sponsorship value was therefore associated with the sale of sponsorships for Gazelle games, as these games would feature on premium television channels.

43. The cancellation of HOF games meant that a higher percentage of sponsorship sales were associated with Gazelle's games, which led to a higher percentage of sponsorship revenues payable to Gazelle under the Agreement.

44. The cancellation of HOF games also meant that Gazelle incurred a greater share of the event's expenses, because expenses such as COVID-19 testing were calculated on a per-game basis.

45. As the games neared their conclusion, HOF expressed concern that the cancellation of its games would mean less revenue for HOF than it had initially anticipated.

46. In a meeting between representatives of HOF and Gazelle, HOF asked whether Gazelle would agree to change the terms of the Agreement, to provide more revenue to HOF.

47. Gazelle refused to amend the Agreement, and during these discussions, HOF and Gazelle called IMG's representative, who again confirmed the terms of the Agreement, including the Sponsorship Calculation.

48. As a result of those conversations and IMG's confirmation of the agreed upon terms of the Agreement, HOF dropped its request to amend the Agreement at that time.

### Gazelle Seeks Payment for Its Share of the Sponsorship Revenue

49. Upon the conclusion of the games, the parties collected sponsorship revenues and paid expenses.

50. When all revenues and expenses had been determined, Gazelle calculated the Final Distribution pursuant to the Agreement.

51. Gazelle relied on the Agreement that the parties had previously reached, memorialized in the emails and spreadsheets that the parties had exchanged, to calculate the Final Distribution.

52. Based on the Sponsorship Formula and the Expense Formula, Gazelle was owed at least $149,878.61 from HOF, and Gazelle sought distribution from HOF of this amount.

### HOF Refuses to Abide by the Agreement

53. Despite its prior commitments pursuant to the Agreement, HOF sought to force Gazelle to accede to entirely new terms, months after the Agreement and after the games had been played.

54. Instead of paying its obligations under the Agreement, months after the games had finished HOF generated an entirely new calculation, with an entirely new distribution of sponsorship revenue, that heavily favored HOF to the detriment of Gazelle.

55. HOF had never before claimed to Gazelle that sponsorship revenue would be calculated or distributed in this new manner, and Gazelle had never previously seen the calculations which HOF now sought to use.

56. Tellingly, although it sought to change the Sponsorship Formula in ways that would benefit HOF, HOF did not make any changes to the Expenses Calculation.

57. The cancellation of HOF's games had reduced the share of sponsorship revenue to which HOF was entitled under the Agreement.

58.     But those same cancellations had pushed an increased percentage of per-game expenses onto Gazelle, and changes to the Expenses Formula would have favored Gazelle.

59.     Rather than be consistent and seek to amend both the Sponsorship Formula and the Expenses Formula, HOF only sought changes to the Sponsorship Formula, because those changes favored HOF.

60.     Under HOF's new calculation, HOF sought to pay Gazelle just $72,631.30.

61.     On April 1, 2021, when HOF appeared unwilling to abide by the Agreement, Gazelle demanded full payment under the agreement.

62.     HOF, apparently unhappy with the deal it had agreed to, refused to pay the money it owed to Gazelle.

**HOF Withholds Funds from Gazelle to Seek New Terms That Benefited HOF
and to Which the Parties Had Never Agreed**

63.     HOF had no right to change the Agreement at this late date, and Gazelle refused to agree to any amendment.

64.     But HOF evidently decided that it had leverage, in the form of the sponsorship revenue that it had collected for (i) sponsorships that HOF sold for Gazelle games and (ii) sponsorships that HOF sold for jointly organized games – including the portions of those funds that HOF owed to Gazelle under the Agreement.

65.     HOF therefore withheld the funds that it owed to Gazelle – including the $72,631.30 that HOF admitted it owed to Gazelle under HOF's newly-devised calculations.

66.     Using those funds as leverage, HOF sought to force Gazelle to agree to new terms that favored HOF.

67. At one point, HOF told Gazelle that HOF had a check in its Springfield, Massachusetts offices that it would send to Gazelle, but only if Gazelle accepted HOF's revised terms.

68. And on a series of calls and virtual meetings between Gazelle's representatives and HOF's representatives, HOF demanded that Gazelle agree to HOF's terms and refused to remit any payment to Gazelle absent agreement on those terms.

69. Even now, HOF continues to hold all of the funds it collected from the games at Mohegan Sun Arena, even the $72,631.30 that HOF admitted it owed to Gazelle under HOF's newly-devised calculations.

70. HOF has continued to demand that Gazelle agree to HOF's amendments to the Agreement in order for Gazelle to receive any portion of payment Gazelle is owed under the Agreement.

71. HOF's representatives attended the calls and virtual meetings in which HOF confirmed the Agreement and conducted planning and logistics meetings from HOF's offices in Massachusetts.

72. On information and belief, HOF's representatives read and drafted the emails in which HOF confirmed the Agreement and conducted planning and logistics meetings at HOF's offices in Massachusetts.

73. HOF's representatives attended the calls and virtual meetings in which HOF sought to change the terms of the Agreement, using HOF's improper retention of funds it owed to Gazelle as leverage, from HOF's offices in Massachusetts.

Case 3:22-cv-30028 Document 1 Filed 03/10/22 Page 11 of 15

74. On information and belief, HOF's representatives drafted the emails in which HOF sought to change the terms of the Agreement, using HOF's improper retention of funds it owed to Gazelle as leverage, at HOF's offices in Massachusetts.

75. On information and belief, HOF formed and executed its plan to use the improper retention of funds it owed to Gazelle as leverage at HOF's offices in Massachusetts.

76. On information and belief, HOF collected the sponsorship revenues that it owes to Gazelle from HOF's offices in Massachusetts.

77. On information and belief, HOF holds the sponsorship revenues that it owes to Gazelle in Massachusetts.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract

78. Gazelle repeats and realleges the allegations made in Paragraphs 1 to 77.

79. Gazelle and HOF entered into the Agreement, a valid and enforceable contract.

80. Gazelle has fulfilled all of its obligations under the Agreement.

81. Among other things, HOF, and its agent, IMG, promised to divide sponsorship revenue as follows:

   a. A commission was only payable if one entity sold sponsorships for the other entity's games;

   b. Gazelle would receive a 20% commission if it sold sponsorships for HOF games, with the remaining 80% payable to HOF;

   c. HOF would receive a 20% commission if it (or IMG on HOF's behalf) sold sponsorships for Gazelle games, with the remaining 80% payable to Gazelle; and

    d. For the sale of sponsorships for any jointly organized games, the commission structure consisted of 30% payable to the selling entity, with the remaining 70% to be split equally between Gazelle and HOF.

82. HOF breached the terms of the Agreement by failing to remit to Gazelle the net amount owed to Gazelle.

83. As a result of HOF's breaches of the Agreement, Gazelle has suffered substantial damages, in an amount to be determined at trial.

## COUNT II
### Violation of M.G.L. ch. 93A §§ 2, 11

84. Gazelle repeats and realleges the allegations made in Paragraphs 1 to 83.

85. At all times material hereto, HOF was engaged in trade or commerce.

86. At all times material hereto, Gazelle was engaged in trade or commerce.

87. HOF willfully and knowingly engaged in unfair and deceptive acts by withholding funds it admittedly owed to Gazelle to gain leverage over Gazelle and seek retroactive amendment of the Agreement.

88. HOF willfully and knowingly engaged in unfair and deceptive acts by seeking amendments to the Agreement that increased revenues paid to HOF but ignored the additional expenses that Gazelle had paid.

89. The unfair and deceptive acts of HOF violated M.G.L. ch. 93A § 2.

90. The unfair and deceptive acts of HOF occurred primarily and substantially in the Commonwealth of Massachusetts.

91. Gazelle has suffered, and will continue to suffer, substantial damages and other losses as a result of the unfair and deceptive acts of HOF in violation of M.G.L. ch. 93A § 2.

92. The acts of HOF, described above, constituted willful and knowing violations of M.G.L. ch. 93A § 2.

93. Gazelle is entitled to actual and multiple damages and attorneys' fees pursuant to M.G.L. ch. 93A § 11.

## COUNT III
### Unjust Enrichment

94. Gazelle repeats and realleges the allegations made in Paragraphs 1 to 93.

95. Gazelle provided services, including selling sponsorships, paying expenses, and enlisting basketball teams to play games at Mohegan Sun Arena.

96. HOF benefited from the services that Gazelle provided.

97. HOF collected funds that rightfully belong to Gazelle, based on the parties' agreement and course of conduct.

98. HOF wrongfully withheld funds that are properly the property of Gazelle without legitimate legal justification or privilege.

99. Upon information and belief, HOF holds Gazelle's money to coerce Gazelle to change the agreed-to terms of the parties' relationship.

100. Equity does not permit HOF to continue to possess the money it is unlawfully withholding from Gazelle.

101. Equity does not permit HOF to benefit from the services that Gazelle provided without paying for those services.

102. Gazelle is entitled to the value of the services it provided and/or the funds that HOF is unlawfully withholding.

## REQUESTS FOR RELIEF

Gazelle respectfully requests the Court to:

A. Enter judgment in favor of Gazelle and award damages;

B. Award Gazelle treble damages pursuant to Chapter 93A, § 11;

C. Award Gazelle its costs, expenses, and attorney's fees; and

D. Enter such further relief as is just.

## JURY DEMAND

Gazelle demands a trial by jury as to all claims or issues so triable.

Dated: March 10, 2022

THE GAZELLE GROUP, INC.

By its counsel,

_____
Nicholas Ramacher (BBO #680258)
DONNELLY, CONROY & GELHAAR LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
njr@dcglaw.com

Siobhain McSweeney (*pro hac vice* pending)
McMahon, Martine & Gallagher, LLP
55 Washington Street, Suite 720
Brooklyn, New York 11201
(212) 747- 1230
smcsweeney@mmglawyers.com

A.  Enter judgment in favor of Gazelle and award damages;

B.  Award Gazelle treble damages pursuant to Chapter 93A, § 11;

C.  Award Gazelle its costs, expenses, and attorney's fees; and

D.  Enter such further relief as is just.

## JURY DEMAND

Gazelle demands a trial by jury as to all claims or issues so triable.

Dated: March 10, 2022   THE GAZELLE GROUP, INC.

By its counsel,

*/s/ Nick Ramacher*

Nicholas Ramacher (BBO #680258)
DONNELLY, CONROY & GELHAAR LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
njr@dcglaw.com

Siobhain McSweeney (*pro hac vice* pending)
McMahon, Martine & Gallagher, LLP
55 Washington Street, Suite 720
Brooklyn, New York 11201
(212) 747-1230
smcsweeney@mmglawyers.com

14